G. SCOTT DAVIES, Appellant, v. G. FRED STAYTON, Appellee.

No. 44528.

JANUARY 17, 1939.

REHEARING DENIED JUNE 23, 1939.

L. S. Forrest, for appellant.

Parrish, Guthrie, Colflesh & O'Brien, for appellee.

RICHARDS, J.—In this action plaintiff demanded from defendant an accounting of the profits of two Iowa-chartered corporations, known as Paramount Products, Inc., and the Betty

White Corporation. The trial court, holding against plaintiff's contention that he was entitled to an accounting, dismissed the petition with judgment in favor of defendant for the costs. Plaintiff has appealed. It will perhaps make for clarity, if before discussing the questions of fact that are presented, we advert to the subject matter of the controversy and to certain salient facts that are conceded.

On February 7, 1934, a certificate of incorporation was issued to Paramount Products, Inc. The incorporators were plaintiff and defendant. The incorporating was in furtherance of a verbal agreement between them that contemplated the carrying on of what they designate as "sales contests." The capital authorized was $20,200 divided into 200 shares of Class A stock, par value $100 each, and 200 shares of Class B stock, par value $1 each. The articles provided that holders of shares were to have equal voting rights, and equal rights to share in the profits, in proportion to the number of shares held and regardless of the classification of the stock. Plaintiff, an attorney practicing in Des Moines, found among his clients purchasers of approximately $9,250 of Class A stock. Defendant also effected stock sales. On July 31, 1934, all Class A stock had been issued. As shares of Class A stock were sold, shares of Class B stock in equal number were issued to defendant, for which he paid $1 per share. Defendant also held several shares of Class A stock, with the result that at all times he had voting control of the corporation.

The corporation commenced transacting business soon after February 7, 1934. Its officers and directors were plaintiff and defendant. The merchandise chosen for the purpose of conducting "sales contests" consisted of cosmetics and toilet articles, none of which the corporation manufactured or produced. All was procured from various sources by purchase. During its brief existence the corporation carried out three of these "sales contests", all conducted in the same manner. The first was started in March 1934. September 29, 1934, at midnight, was the predetermined closing date. At the outset $4,305 was withdrawn from the corporation's funds and placed in a special bank deposit. This was the amount of the "grand prize list." Conspicuous advertisements, incorporating puzzles, were then published in magazines and newspapers. Each advertisement stated that to any person who solved the puzzle there would be mailed com-

plete information as to the manner of awarding prizes. To each person who sent in an answer to the puzzle there was mailed the first of six "broadsides" that had been prepared, and rules governing the contest. This "broadside" was 20 by 25 or 18 by 26 inches in size, printed on both sides, in two colors, with half-tones of three automobiles, and illustrations of other prizes, allegedly amounting in all to the value of $4,305. The "broadside" stated that these "grand prizes" were to be awarded to those who sold, during the period of the contest, the largest amounts of the merchandise the corporation was putting out. If the person to whom the "broadside" was mailed remitted $2 and signed the order blank which accompanied the "broadside", there were sent to him 6 pieces of merchandise, and he was credited with a certain number of "votes", toward winning a prize. A receipt was mailed for the $2 with a request that an order for $4 be sent in. From then on approximately 150 carefully prepared form letters, in a series, were mailed, the purpose being to induce a continuation of orders. Accurate statistics of the effectiveness of these letters were kept, on the basis of which re-writes were frequently made. There were also sent out offers of small special cash prizes to those who would send in the largest amount of orders within specified periods. As testified by defendant, "In that way we maintained their interest and kept them sending us orders." At any given time during the contests, the persons contending for the prizes averaged in number from 18,000 to 28,000. (The record not being clear, the average of 28,000 may have been in one of the Betty White Corporation contests.) The publishing in magazines and newspapers of advertisements required to interest so many persons in such a project consumed a considerable portion of the money derived from those who contended for the prizes. During its three contests the amount paid by Paramount Products, Inc. for magazine and newspaper advertising was approximately $235,000. Another item of expense was defendant's salary amounting to $22,650, to September 1, 1935.

Toward the end of August 1935 Paramount Products, Inc. discontinued its business. All capital stock was surrendered with written consent of the holders that the corporation be dissolved. Class A stock was retired in this manner—the corporation returned to the holders $20,000, being the sum total of their original investments, and in addition, including all divi-

dends, paid them a profit somewhat in excess of $60,000. The Class B stock, all held by defendant, was retired by returning to him his original investment of $200, and by paying to defendant the same amount of profit that went to holders of Class A stock, that is an amount that exeeded $60,000. Those who were the ''contestants'' appear to have realized, out of the remittances they sent in, the three ''grand prize lists'' each valued at something like $4,305 and some small special cash prizes.

On August 30, 1935, a certificate of incorporation was issued to the Betty White Corporation. Defendant Stayton was the sole incorporator. The authorized capital was $20,000 divided into shares of $100 each. The business in which this corporation engaged was the carrying on of ''sales contests'', three in number, similar to those that had been conducted by Paramount Products, Inc., already described. The Betty White Corporation was dissolved in October 1936. It had expended for the publishing of magazine and newspaper advertisements approximately $340,000, had paid defendant a salary of $26,000, and had paid back to the stockholders all of their $20,000 stock investment, and a profit of $131,800.

The litigants concede that plaintiff was to receive one third of the profits upon Class B stock of Paramount Products, Inc., the equivalent of one sixth of the profits of the corporation, and they concede that plaintiff did receive from defendant one third of the $60,000 plus of profit paid on Class B stock. But at this point in the record the controversial matters appear. That they may be envisioned, a narration of transactions had in December 1933 and in the early months of 1934 seems to be required.

In a conversation between these litigants in the latter part of December 1933, defendant made reference to his previous experiences in conducting ''sales contests'' and indicated his purpose to again enter that field, if capital could be obtained. He informed plaintiff that he, defendant, could procure on credit the publishing of advertising costing any amount up to $100,000, but that $20,000 of actual capital was essential. Plaintiff journeyed to Chicago, verified the matter of credit, which he found would be extended by an advertising agency, and stated that he would undertake to help raise the $20,000. Both parties testified that their original plan was to agree between themselves and with those by whom the $20,000 might be invested,

that the profits would be distributed in equal parts, one third to such investors, one third to plaintiff, one third to defendant. But because investors could not be interested upon that basis, the plan was altered, and plaintiff and defendant agreed that the investors of the $20,000 should have one half the profits, defendant one third and plaintiff one sixth.

What has been related was the entire agreement with respect to profits, according to defendant's version of these oral arrangements. That what has so far been related was merely a portion of the contents of the oral agreement between plaintiff and defendant is strenuously urged by plaintiff. He maintains that a part of the oral agreement between him and defendant was that plaintiff's share of profits would be reduced to one sixth temporarily, and that later plaintiff and defendant would buy the business, and thereafter conduct it as the sole proprietors, each taking 50% of the profits. Plaintiff relying on that assertion of fact, takes the position that he and defendant embarked upon and have been engaged in a joint adventure, and that each is entitled to one half of the profits from and after the elimination of the original investors in Paramount Products, Inc. Plaintiff seeks in this action to compel defendant to account to him for such portion of the profits of the alleged joint adventure as plaintiff has not received, that is, for one half of the profits "derived through the instrumentality of the Betty White Corporation."

Concerning this dispute, as to what was the oral agreement of these parties, each testified. As corroborating his contention plaintiff points out that on direct examination, after describing the necessity that arose for increasing to one half the investors' share of the profits, defendant testified in these words:

"That called for a re-arrangement of our percentage, and I told Mr. Davies that under no conditions would I be satisfied with less than one-third of the profits; that while I thought that the business would make enough money anyhow, that I would then make up the difference between my one-third and the point where the stockholders and investors would have one-half, so it worked out on the basis of the investors having fifty per cent, myself having the other fifty per cent, and under the agreement I agreed to give Mr. Davies one-third of my one-half."

In commenting on this testimony plaintiff urges that the

difference to be made up was that between his originally arranged one third of the profits and the one sixth to which his share was reduced. So, says plaintiff, in this testimony defendant has admitted what plaintiff claims was the oral contract, excepting that defendant did not mention the manner in which defendant agreed to make up this difference. But another meaning may have been intended by the witness. At the time he testified he was referring to events in retrospect. He was conscious that in the past he had acquired all the "B" stock. He recognized he was not entitled to plaintiff's one third of the profits thereon. This difference between all the profits on the "B" stock he had acquired, and the profits to which defendant was in fact entitled, may have been the difference to which he was alluding. There was no cross-examination upon this particular phase of defendant's testimony. Defendant further testified that there was no agreement that he and plaintiff would acquire the business or share its profits excepting in the manner that was carried out in Paramount Products, Inc. Each party offered testimony of other witnesses that tended somewhat to corroborate them respectively.

With what the parties as witnesses said there is interwoven the evidence of their previous actions. On February 17, 1934, they signed an instrument wherein it was agreed that, for the efforts put forth by G. Scott Davies (now plaintiff) in the securing of capital stock and legal advice in the Paramount Products, Inc., "He is to share one-third interest in the profits made from Class B common stock, or one-sixth interest in the profits earned by Paramount Products, Incorporated." This instrument was subsequent to the alleged oral agreement on which plaintiff relies. Although it does not embody the matters plaintiff says were in the oral agreement, this may not be at all conclusive concerning the contents of the oral contract, because the purpose of this written instrument may have been a single one, i. e., to furnish to the advertising agency a fixation of plaintiff's interest in the profits of the corporation to which the agency was extending credit. This the agency had requested. Of perhaps greater import are other matters found in the record. In August 1935 plaintiff surrendered the stock he held in Paramount Products, Inc., accepted his profits, consented to dissolution, assisted in procuring like action on part of other stockholders, and knew the Betty White Corporation was being

set up, but all this was without outward manifestation by plaintiff that he deemed himself entitled to a half interest in the new corporation or in its profits. If at that time it was in plaintiff's mind that there was an oral agreement whereby he and defendant would buy the business and become co-proprietors, one would naturally expect to find in the record evidence in some manner relating to the furnishing or to the reason for not furnishing, by plaintiff, of a co-proprietor's portion of the $20,000 of capital. Such evidence does not appear. What is shown is this—plaintiff, desiring stock in the Betty White Corporation, gave defendant a check for $4,000. But on or before September 3, 1935, plaintiff and his wife were alloted stock in the amount of only $1,000, and for the residue of the $4,000 notes of the corporation for $3,000 were given to plaintiff and his wife, and these were later paid. The stock and notes were accepted without protest. On September 3, 1935, plaintiff and his wife signed a writing appointing defendant as their proxy to vote their ten shares at the first stockholders meeting. The things that were done by plaintiff in acquiring this $1,000 of stock were not acts to be expected from a person claiming to be, of right, a co-proprietor. His subsequent actions as a holder of this stock have not the appearance of the acts of one having the rights plaintiff now asserts. That is, in June 1936 a dividend of 500% was being paid to the stockholders, and that plaintiff so knew is apparent, for he and his wife each received $2,500 of the dividend declared. At this time plaintiff, neither by word nor by act, indicated that he had interests in the Betty White Corporation other than as a holder of the stock he had purchased. No intimation came from him that the 500% dividend was being disbursed to those not entitled thereto. The final contest of this corporation ended July 31, 1936, and it prepared for dissolution, which was accomplished in October 1936. It was on September 17, 1936, that plaintiff first made known what he now says was a portion of the oral agreement made prior to February 7, 1934.

A circumstance known to plaintiff was this. After Paramount Products, Inc. had conducted three ''contests'' its dissolution was the only course of action that was beneficial to the profit takers. For by that time the corporation was without future prospects, output of its merchandise was practically at an end, and as a going concern it possessed nothing in the nature of good will. There was no probability that a fourth time it

could cultivate a profitable crop of "contestants." So in the fact of dissolution we are unable to see anything of substance that would have warranted plaintiff in believing, as he says he did, that the dissolving of Paramount Products, Inc., was being brought about by Stayton in order to carry out the alleged oral agreement. The dissolution seems to have been more a matter of natural consequence, inherent in the manner in which the business was conducted. With all of this plaintiff was acquainted.

In these transactions and circumstances, prior to the appearance of the parties on the witness stand, there is such inconsistency with plaintiff's version of the oral agreement that it appears to us plaintiff has not successfully borne the burden of establishing the alleged oral contract on which he bottoms his theory of joint enterprise. The trial court correctly held that plaintiff had not established his right to an accounting.

Other matters are urged by plaintiff in argument—that defendant's salary of $500 per week from and after January 1, 1935, was excessive and illegally exacted,—that there was no dissolution of the Paramount Products, Inc. because consent thereto by plaintiff was obtained by fraud,—that defendant violated fiduciary duties and relationships to the stockholders by fraudulent concealment of an intention to acquire for himself the assets of Paramount Products, Inc. The showing on which plaintiff depends does not in our opinion sustain these points to which the argument is directed. It would serve no justifiable end to set out the record in further detail. The decree and judgment of the trial court is affirmed.—Affirmed.

MITCHELL, C. J., and HAMILTON, OLIVER, STIGER, HALE, BLISS, MILLER, and SAGER, JJ., concur.